# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

LINCARE, INC.,

      Plaintiff,

v.

                                          Case No. 8:20-cv-1002-T-02AAS

ESTHER D. TINKLENBERG,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

This matter came before the Court after a hearing upon Plaintiff's motion for preliminary injunction and Defendant's response. Docs. 9, 31, 37, 38, 39. Plaintiff seeks to enforce a non-competition and confidentiality agreement ("noncompete") between Plaintiff and Defendant Ms. Tinklenberg, a former key employee who left Plaintiff's employ to become Chief Operating Officer (Home Medical Equipment) and LLC member of Thrive Skilled Pediatric Care LLC ("Thrive"). The subject noncompete is attached to this Order as an Appendix.

The Court grants the motion for preliminary injunction in part, upon posting of a $250,000 bond by Plaintiff. The Court grants the injunction fully as it pertains to Lincare's trade secrets and confidential information. Concerning the restraint upon employment, Ms. Tinklenberg is enjoined and barred for the period of 18

months (the date to start when Lincare posts the required bond) from participating, directly or indirectly, or having anything whatsoever to do with the adult and pediatric nutritional or enteral/parenteral business of her new company Thrive, in any manner. Further, she is enjoined and barred for the same period from participating directly or indirectly or having anything whatsoever to do with any adult or pediatric oxygen, respiratory, or ventilator business of her new company Thrive, in any manner. Finally, Ms. Tinklenberg is ordered to pay the reasonable attorney's fees and costs of Plaintiff for enforcement of this noncompete.

## FACTUAL BACKGROUND

Plaintiff is a large medical-related services and supply company. Defendant worked for Plaintiff for 22 years. Defendant started out in 1998 working for Plaintiff as a "Center Manager – Sales and Operations," where she had four direct reports and established a start-up center that she grew to over 300 patients, involving oxygen and respiratory products. She quickly progressed through the ranks and became an area manager in 2000, where she had full profit and loss responsibility for 13 centers across the state of Kentucky, and led a 65-person team. Doc. 37-10. In this role Defendant achieved 200% growth goals in her field of oxygen and respiratory medication products, and was ranked in the top ten of 120 area managers. She was selected to develop and deliver respiratory medical sales presentations company-wide. *Id.*

Defendant progressed to regional manager by 2010, where she directed all operations of more than 50 adult and pediatric respiratory centers in 13 states, plus directed the nursing home ventilation business nationwide. *Id.* Her region generated over $9 million in monthly sales revenue and she led over 500 employees with a 9-person management team. Defendant also led an acquisition and opened four new operational centers which added $2 million to Plaintiff's annual revenue. *Id.*

By 2016 Defendant was the nationwide head of Plaintiff's enteral business.[1] She led a team of 9 direct reports and nearly doubled revenue in three years, with responsibility for $12 million in annual revenue, up from $6.7 million when she started in that post. *Id.*

Given her advancement and success as a manager with Plaintiff, it is not surprising that Plaintiff offered Defendant a $102,752 bonus in 2013 for signing a "Lincare Key Employee Confidentiality and Restrictive Covenant Agreement." *See* Appendix to this Order. Defendant took the money and bound herself to this noncompete contract. Page One of that noncompete states that Plaintiff has designated Defendant "as an important and key employee with significant responsibility for the success of the Company . . . ." *Id.* at 1. On that same page it

---

[1] Enterals, generally speaking, are the provision of nourishment to a patient, most often but not always through a feeding tube. A related concept, parenteral, means generally the provision of nourishment or other bodily needs through a conduit other than the alimentary canal.

also details the importance of Defendant as an executive for Plaintiff, and states that Plaintiff has made great investments in Defendant's career, business relationships, skills, and "knowledge specific to the businesses of the Lincare Entities." *Id.* It goes on to say that the contractual promises therein made were "in consideration of the mutual agreements and covenants contained in this Agreement, including, without limitation, the money consideration contained in Section 1 and for good and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged." *Id.* At the end of the noncompete the parties also agreed that the contractual promises therein "must not be amended, modified, or otherwise changed except by a writing signed by the Parties," nor could terms be canceled or waived except by a signed writing. *Id.* at 4–5, par. 5. There has been no later modification or amendment of the noncompete signed by the parties.

Although Defendant received a sizable bonus for signing the noncompete, the agreement makes no promises about her continued employment, salary, or bonus. The contract is independent of and free from any ongoing duty concerning Defendant's tenure at Lincare. To the contrary, the noncompete contract states, "[t]his Agreement in no way alters or affects [Defendant's] status as an at-will employee of Lincare." *Id.* at 5.

The noncompete states that it applies for whatever reason Defendant might cease work at Lincare. The terms state that for 18 months following Defendant's termination from Lincare "for any reason or no reason, including the voluntary termination of employment by [Defendant] for cause or without cause or the involuntary termination of employment by the Company for cause or without cause," *id.* at 1–2, par. 2, Defendant will not participate in any prohibited business within any state where Defendant had management, sales, or marketing responsibilities for the two years prior to her termination. *Id.*[2]

As is common in many noncompete agreements, the parties agreed that the restrictions therein were reasonable with respect to duration, geographical area, and scope. *Id.* at 3–4. They also agreed that money damages would not adequately recompense for a breach of the noncompete and that Plaintiff Lincare shall be entitled to injunctive relief and an accounting in the event of a breach. *Id.*

---

[2] "Prohibited Businesses" are defined as "any business activity similar to those engaged in by any of the Lincare Entities during the Employee's employment with Lincare and during the Restriction Period, such businesses including, without limitation, the business of marketing, advertising, selling, leasing, renting, distributing or otherwise providing oxygen, oxygen equipment, aerosol inhalation therapy equipment and respiratory medications, infusion and pain management, enteral and parenteral, PT/INR monitoring or testing, personal emergency response system monitoring, nasal continuous positive airway pressure devices, monitoring or testing, personal emergency response systems monitoring, nasal continuous positive airway pressure devices, infant monitoring equipment and services, home sleep studies-related therapy equipment, and other respiratory therapy and durable medical equipment, products, supplies and services to customers in their homes or other alternative site care facilities." Appendix at 2.

The noncompete sets local venue and Florida substantive law as controlling any dispute. *Id.*

In April 2020, seven years after signing the noncompete and receiving the money, Defendant took a new job as Chief Operating Officer, Home Medical Equipment with Thrive.[3] Thrive is smaller than Plaintiff, but still sizable, with revenues of approximately $120 million annually. Defendant testified in her deposition that Thrive operates in nine states and Thrive and Lincare have overlapping lines of business, and have suppliers and vendors in common.[4] Thrive's web site shows also shows several overlapping lines of business with Lincare. Doc. 37-8. Both companies work off of referral sources in the healthcare industry. Defendant's supervisor at Lincare also testified that Thrive "clearly is a competitor."[5] This conclusion is borne out by the present record.

Plaintiff brought a three-count complaint against Defendant. Doc. 1. Count I is a contract count; Count II seeks recovery for theft of trade secrets; and Count III seeks preliminary and permanent injunctive relief under the noncompete. The parties engaged in truncated discovery under parameters they agreed to. *See* Doc. 22. Each side took one deposition although they had agreed to more.

---

[3] Defendant's deposition at 45–46.
[4] Defendant's deposition at 56–76.
[5] Bower deposition at 8.

The Court had before it Plaintiff's verified complaint, Doc. 1, Plaintiff's Motion for Preliminary Injunction and Memorandum of Law, Doc. 9, Plaintiff's filing of documents in support of the motion, Doc. 37, Defendant's Memorandum on Law Opposing Injunction, Doc. 39, and Plaintiff's Notice of Filing Affidavit, Doc. 38. The Court then held a lengthy oral argument on the motion for preliminary injunction, offering the parties the ability to present anything they wished, including live testimony. Docs. 36, 40. The parties thereafter submitted, and the Court has reviewed, depositions of Defendant and her Lincare Supervisor Steven Bower[6]. The Plaintiff's proof offered was through a verified complaint, through a filing of documentary materials including portions of Thrive's website, and via the depositions and exhibits.

The evidence showed that after her departure from Lincare the Defendant retained or possessed a significant number of proprietary business and training documents of Lincare. Some of these were recent. These materials include price data, and documents titled "Area Management Training" and "Selling and Managing the Lincare Way. Grow Your Business. Grow Your People.," that were given to Defendant at a Lincare regional management meeting in Spring 2019.

---

[6] These depositions are filed in redacted form to protect trade secrets. Unredacted copies are filed under seal.

## ANALYSIS

The Court must address the contract between the parties in light of the Florida substantive law which governs it. Florida Statute Section 542.335 gives the substantive rules to apply. *Proudfoot Consulting v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009). As to the elements or procedural requirements for a preliminary injunction under Fed. R. Civ. P. 65, the Eleventh Circuit teaches that it is an "extraordinary and drastic remedy" that should only be granted when movant carries the burden of persuasion as to the following elements: 1) substantial likelihood of success on the merits; 2) the Plaintiff will suffer an irreparable injury without an injunction; 3) the threatened injury to the Plaintiff outweighs the threatened harm the injunction may cause to the Defendant, and 4) that granting the preliminary injunction will not be adverse to the public interest. *Warren Publ'g, Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir. 1997).

***As to Likelihood of Success on the Merits:*** Pursuant to Section 542.335, Florida Statutes, the restrictive covenants contained in the noncompete are reasonable in time and area. As discussed below, the Court exercises its discretion to significantly reduce the noncompete as to "line of business." With this modification to reduce the barred lines of business, the likelihood that Plaintiff will have success on the merits of the Verified Complaint is very high. *See, e.g.,*

8

*Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1246 (11th Cir. 2009) (enforcing restrictive covenants against a business consultant subsequently employed by a direct competitor of the former employer); *Litwinczuk v. Palm Beach Cardiovascular Clinic*, 939 So. 2d 268, 270 (Fla. 4th DCA 2006) (enforcing restrictive covenants against a physician where the line of business was defined as a "competing enterprise").

The restrictions in the noncompete are narrowly tailored to be "reasonable in time [and] area" in that Defendant is restricted from engaging in competitive business activities for a period of only eighteen months, and only in the "state or states in which [Defendant] had management, sales, marketing or clinical responsibilities during the 2-year period immediately prior to [her] cessation of employment with Lincare," which in her case (as the top nationwide director of the enteral business) were nationwide responsibilities. Doc. 1 at ¶¶ 11, 15, 21. These provisions are eminently reasonable and enforceable under Florida law. Section 542.335(1)(d)(1), Fla. Stat., provides: "[i]n the case of a restrictive covenant sought to be enforced against a former employee ... and *not* associated with the sale of all or a part of ... [t]he assets of a business or professional practice," then "a court shall presume reasonable in time any restraint 6 months or less in duration and shall presume unreasonable in time any restraint *more than* 2 years in duration." Fla. Stat. § 542.335(1)(d)(1 (emphasis added). This time constraint fits

well within the guidelines. *Thomas v. Osler Medical, Inc.*, 963 So. 2d 896 (Fla. 2d DCA 2007) (enforcing two-year restriction); *Litwinczuk*, 939 So. 2d at 270–73 (same); *Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209 (S.D. Fla. 2005) (enforcing a one-year non-competition clause and two-year non-solicitation clause).

Defendant argues that the noncompete restraints are overbroad as to the area and lines of business. Doc. 39 at 8. The Florida statute counsels the Court to modify or limit the restraint where appropriate. Fla. Stat. § 542.335(1)(c). The Court now modifies and limits the noncompete concerning the lines of business that the injunction covers and explains its reasoning as follows: The statute requires the Plaintiff to prove the existence of one or more legitimate business interests justifying the restriction covenant. Fla. Stat. § 542.335(1)(b). It further instructs the court to "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." *Id.* § 542.335(1)(h). In so construing the noncompete, the statute states that:

> If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restrain and grant only the relief reasonably necessary to protect such interest or interests.

§ 542.335(1)(c).

The Court's ability to modify or limit a noncompete as set forth here is

10

called "blue-penciling." The power arises by this Florida statute, but also reflects that the Court is sitting as chancellor in equity. Concerning this authority, the Florida Supreme Court has noted "the statute ameliorates any concern regarding overly restrictive covenants [and] commands courts to modify, or blue pencil, a non-competition agreement that is 'overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest[.]'" *White v. Mederi Caretenders Visiting Servs. of Se. Fla.*, 226 So. 3d 774, 785 (Fla. 2017) (quoting Fla. Stat. § 542.335(1)(c)). The Florida Supreme Court further notes the statute instructs "courts to 'grant only the relief reasonably necessary to protect such interest.'" *Id.* (quoting Fla. Stat. § 542.335(1)(c); *see also PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1227 (M.D. Fla. 2012). As the Florida Supreme Court held, this "statute grants trial courts fairly wide discretion to fashion the appropriate context-dependent remedy." *White*, 226 So. 3d at 785.

The Court exercises its "fairly wide discretion" and holds that the line of businesses for which Defendant would be restrained is too broad. The "Prohibited Businesses" from which Defendant is barred (listed in the Appendix at 2; and *see* n.2, *supra*) are too broad and basically would preclude Defendant from working in the health care supply field at all—having little to do with protecting Plaintiff's legitimate business. This overbroad list exceeds Plaintiff's legitimate business interests in protecting itself from unfair advantage by its former manager.

11

Accordingly, the Court "blue-pencils" the restraint: Defendant will be restrained by the noncompete for 18 months as to the two specific lines of business for which she had management authority at Plaintiff Lincare: all enteral/parenteral business; and all oxygen, respiratory, and ventilation business. *See* Doc. 37-10 (Defendant describing her significant managerial responsibility in these two business lines). Plaintiff has clearly established that, so limited by blue-pencil, the restraint is reasonably necessary, and falls within the contract for which Defendant took a large sum.

*As to Irreparable Harm:* Once a substantial likelihood of success on the merits is established, there is a rebuttable presumption of irreparable harm. Fla. Stat. § 542.335(1)(j) ("The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."); *see Transunion Risk & Alternative Data Solutions, Inc. v. Maclachlan*, 625 F. App'x 403, 405–06 (11th Cir. 2015). Defendant has not rebutted this presumption.

The risk of irreparable harm is substantial. In addition to what may be some calculable damages, Plaintiff is facing irreparable harm unless injunctive relief is granted because Defendant is the Chief Operating Officer of a competitor, whose overlapping fields of competition include enteral and parenteral products and services, pediatric vents, and durable medical equipment to patients in their homes

12

or residential facilities. Doc. 1 ¶ 22. Lincare may also incur injuries for which there is no adequate legal remedy, including a loss in goodwill and a loss of valuable relationships with clients and referral sources, all injuries for which no legal remedy lies. *See, e.g.*, *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (loss of goodwill and long-term customers is "difficult, if not impossible, to determine monetarily"); *Basicomputer Corp. v. Walker*, 973 F.2d 507, 512 (6th Cir 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."). Irreparable harm exists where, as here, it is difficult to calculate monetary damages to redress the loss of a client relationship that would produce an indeterminate amount of business in years to come. *See Smart Pharmacy, Inc. v. Viccari*, 213 So. 3d 986, 990 (Fla. 1st DCA 2016); *see also*, Fla. Stat. § 542.335(1)(j) ("The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant.").

Florida law presumes that "violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant." Fla. Stat. § 542.335(1)(j); *GPS Industries, LLC v. Lewis*, 691 F. Supp. 2d 1327, 1337 (M.D. Fla. 2010). For that reason, a party seeking to enforce a non-compete by injunction "need not directly prove that the defendant's

specific activities will cause irreparable injury if not enjoined." *Am. II Elecs., Inc. v. Smith*, 830 So. 2d 906, 908 (Fla. 2d DCA 2002). A violation of the non-compete agreement is itself sufficient to satisfy the irreparable injury requirement of Florida law. *USI Ins. Services of Florida, Inc. v. Pettineo*, 987 So. 2d 763. 766 (Fla. 4th DCA 2008). Accordingly, Plaintiff's irreparable harm is likely.

Defendant took with her, or kept, quite a bit of trade secret-type documents. Injunctive relief is an appropriate remedy to address the misappropriation of trade secrets by a former employee pursuant to the Florida Uniform Trade Secrets Act, Section 688.003(1), Fla. Stat. This is the claim found in the Count II of the Verified Complaint.

A "trade secret" means "information, including ... any business information ... that: (a) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertained by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4). A trade secret is "misappropriated" when it is disclosed or used, without express or implied consent, by a person who knew or had reason to know that her knowledge of the trade secret was "[a]cquired under circumstances giving a rise to a duty to maintain its secrecy or limit its use." Fla. Stat. § 688.002(2).

Plaintiff's filings show that Defendant received much of Plaintiff's sensitive, confidential and proprietary business information, including a specialized database containing detailed, confidential business information concerning Lincare's customers, referral sources, and suppliers. Doc. 1 at ¶ 12. Because Defendant served at a high level, she was privy to information and training and operational data of many sorts. Defendant's current position as Chief Operating Officer at Thrive would enable her to use Plaintiff's trade secret information. Doc. 1 at ¶¶ 21–22.

Customer lists, customer information, and internal financial, marketing, methodology, and research materials are entitled to trade secret protection if security measures are taken to protect such information and the information is not generally available to others. For such documents and information to be a trade secret, the material must reflect "considerable effort, knowledge, time and expense" on the part of the employer, or the information must be secret and not available by other means. *See Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3d DCA 1982); *Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996). Injunctive relief is appropriate under these circumstances. *See AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004) (noting "confidential business information is considered a legitimate business interest that can be protected by a restrictive covenant") (citation omitted); *Sethscot*

*Collection*, 669 So. 2d at 1078 (enforcing injunctive relief to prohibit use of customer information in competing business); *Unistar*, 415 So. 2d at 735 (same).

*As to Balancing Respective Harms Between the Litigants:* The balance of harms favors entry of an injunction because Plaintiff has no adequate remedy at law to redress Defendant's breach of the noncompete. An injunction merely enforces the contractual obligations contained in the noncompete, for which Defendant was well paid. Thus Defendant is not prejudiced while Plaintiff would be prejudiced if its confidential business information and trade secrets were taken, as they appear to have been.

Given the Court's modification of the noncompete, the relative harms to each party in this case surely weighs in favor of issuing a preliminary injunction. *See, e.g., New Horizons Computer Learning Ctrs, Inc. v. Silicon Valley Training Partners, Inc.*, No. 2:02-cv-459-FtM-29SPC, 2003 WL 23654790, at *7 (M.D. Fla. 2003) (balancing favored an injunction where the harm to the employer greatly outweighed the minor harm to an employee, which was merely that the employee could not operate the business he wanted to start for one year).

The respective harm is ameliorated for Defendant because of the blue-penciling. The Defendant is not precluded from working in the health supply or health services field as she might have been had not the Court reduced the "line of business" prohibition. The Defendant—who received a considerable sum in

exchange for the noncompete agreement—is only precluded from working for 18

months in the two discrete areas where she worked for Plaintiff as top manager.[7]

*As to the Public Interest:* Considerations of the public interest include the

need to enforce and provide certainty regarding parties' contractual agreements,

and the need to protect the confidentiality of trade secrets and proprietary business

information. *See Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 959–

62 (Fla. 4th DCA 2010) (the public interest is served in enforcing contractual

rights, including the enforcement of restrictive covenants); *Pitney Bowes Inc. v.*

*Acevedo*, No. 08-21808-CIV, 2008 WL 2940667 at *6 (S.D. Fla. 2008) ("[T]he

public has a cognizable interest in the protection and enforcement of contractual

rights. This interest is particularly strong with respect to non-compete agreements,

as the Florida Legislature has determined that the enforcement of such agreements

is in the public's best interest.") (citations omitted): *see also Southeastern Mech.*

*Servs., Inc. v. Brody*, No. 8:08-cv-1151-T-30EAJ, 2008 WL 4613046, at *16 (M.D.

Fla. Oct. 15, 2008) (holding "a preliminary injunction would affirmatively serve

the public interest by protecting business from misappropriation of confidential

---

[7] In balancing the respective harms, the Court does not follow the admonition of Florida Statute section 542.335(1)(g)(1)("In determining the enforceability of a restrictive covenant, a court...[s]hall not consider any...hardship that might be caused to the person against whom enforcement is sought."). The Court concludes an injunction should issue even if this provision is not applied. This portion of the statute is somewhat in tension with the balancing test required under Fed. R. Civ. P. 65, although the Eleventh Circuit has noted there is not a direct conflict. *Transunion v. MacLachlan*, 625 F. App'x 403, 407 (11th Cir. 2015).

17

information and resources") (citation omitted); *AutoNation*, 347 F. Supp. 2d at 1308 (S.D. Fla. 2004) (noting "policy in Florida favors enforcement of reasonable covenants not to compete"); *New Horizons*, 2003 WL 23654790 at *8 (noting "under Florida law, the public has an interest in the enforcement of restrictive covenants").

***Defendant's Defense is Inapt:*** Defendant asserted a defense that Plaintiff paid her insufficient bonuses for at least two of the most recent quarters in 2019. She asserts this an anticipatory breach or defense that excuses her from the noncompete contract. She asserts her quarterly bonuses were based on a mathematical formula set not in writing but through an oral contract and course of dealing, and she was underpaid on at least her last two bonuses. Her supervisor testified to the contrary, that her bonuses always had a discretionary, non-specific component.

This defense fails. The 2013 noncompete agreement was entire and independent, not a dependent covenant to an oral entitlement to specific bonus level in 2019. *See generally, Richland Towers, Inc., v. Denton*, 139 So. 3d 318, 321–22 (Fla. 2d DCA 2014) (holding independent restrictive covenant enforceable notwithstanding employer's breach of agreement). The noncompete stated that the consideration for it, including a large payment made, was received and sufficient. The noncompete stated in two places that it could not be modified except by signed

writing. No writing exists modifying that stand-alone document. That document says nothing about tenure, pay, or bonuses due Defendant, other than noting she remains an at-will employee.

**The Need for A Bond:** Pursuant to Fed. R. Civ. P. 65(c), Plaintiff must post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." There must be some record basis for the amount posted. The Court concludes that the amount of $250,000 is appropriate; this is the annual base salary for Defendant's present employment at Thrive. This injunction here entered will only become effective once Plaintiff posts that bond.

**Costs and Fees:** Plaintiff also seeks costs and reasonable attorney's fees of this injunction proceeding. These are permitted by the noncompete agreement found in the Appendix and are permitted by section 542.335(1)(k) of the Florida Statutes. Fees and costs of this injunction are granted to Plaintiff.

**WHEREFORE,** the Court grants the motion (Doc. 9) and the following preliminary injunction: The Defendant Esther D. Tinklenberg, and those in active concert or participation with her, are hereby restrained and enjoined, under penalty of contempt, from the following:

1. Directly or indirectly participating in, engaging in, or attempting to engage or participate in, or assisting any other person with engaging or

19

participating in, any enteral/parenteral business or any oxygen, respiratory, or ventilation business anywhere within the United States, where Tinklenberg had management, sales, marketing or clinical responsibilities during the 2-year period immediately prior to her cessation of employment with Lincare, for a period of eighteen months calculated from the date security is posted;

2.    Inducing or attempting to induce any employee of any Lincare Entity to leave his or her employ of such Lincare Entity, or in any way interfering with the relationship between any such employee and such Lincare Entity, for a period of eighteen months calculated from the date security is posted;

3.    Inducing or attempting to induce any customer, supplier, patient, independent contractor, payor, vendor, or referral source of the Lincare Entities at any time during the 2-year period immediately preceding Tinklenberg's cessation of employment with Lincare, to cease doing business with any of the Lincare Entities, or to transact any business with a competitor of any of the Lincare Entities, for a period of eighteen months calculated from the date security is posted; and

4.    Directly or indirectly disclosing, using, publishing, or in any other manner revealing, to any person, firm, corporation, or any other form of business organization or arrangement Lincare's Confidential Information, as

20

defined in the Key Employee Agreement found in the Appendix hereto.

5. If the parties cannot agree on the amount of attorney's fees and costs, Plaintiff shall file its motion for fees and proposed bill of costs no later than July 12, 2020.

**DONE AND ORDERED** at Tampa, Florida, on June 26, 2020.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record

# APPENDIX

Lincare Exhibit 1

1175b
(A)

## LINCARE KEY EMPLOYEE
### CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT

The Key Employee Confidentiality and Restrictive Covenant Agreement (the "Agreement"), is dated March 20th, 2013, by and between LINCARE INC., a Delaware corporation with offices at 19387 U.S. 19 North, Clearwater, Florida 33764 ("Lincare" or the "Company") and Esther D. Tinklenberg, a Lincare employee with an address at 125 Seven Oaks Drive, Richmond, KY 40475 (the "Employee"; together with Lincare, the "Parties").

Whereas, the Employee has been designated by the Company as an important and key employee with significant responsibility for the success of the Company and its parents, affiliates and subsidiaries (the Company and such entities hereinafter referred to as the "Lincare Entities" and, singly, the "Lincare Entity");

Whereas, the Company has invested and will continue to invest significant resources and time training and developing the Employee's skills and knowledge specific to the businesses of the Lincare Entities;

Whereas, the Company has invested and will continue to invest significant resources and time assisting the Employee in developing important business relationships vital to the businesses of the Lincare Entities; and

Whereas, the Parties have determined that the execution of this Agreement directly benefits them and is in their respective best interests.

Now, therefore, in consideration of the mutual agreements and covenants contained in this Agreement, including, without limitation, the monetary consideration contained in Section 1, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.   Payment.   Within 10 business days after Lincare executes this Agreement, Lincare shall pay, or cause the payment, to the Employee a one-time, lump sum payment of $102,752.00, less applicable taxes, deductions and withholdings.

2.   Non-compete and Non-solicitation.   (a)   The Employee agrees that during the period of the Employee's employment and the 18-month period following termination of employment for any reason or no reason, including the voluntary termination of employment by the Employee for cause or without cause or the

involuntary termination of employment by the Company for cause or without cause (the "Restriction Period"), the Employee shall not, directly or indirectly, either for himself or herself or for any other person participate in, engage in, or attempt to engage or participate in, or assist any other person with engaging or participating in, any Prohibited Businesses anywhere within the state or states in which the Employee had management, sales, marketing or clinical responsibilities during the 2-year period immediately prior to such Employee's cessation of employment with Lincare.

(b)   For purposes of this Agreement, (i) "Prohibited Businesses" mean any business activity similar to those engaged in by any of the Lincare Entities during the Employee's employment with Lincare and during the Restriction Period, such businesses including, without limitation, the business of marketing, advertising, selling, leasing, renting, distributing or otherwise providing oxygen, oxygen equipment, aerosol inhalation therapy equipment and respiratory medications, infusion and pain management, enteral and parenteral, PT/INR monitoring or testing, personal emergency response system monitoring, nasal continuous positive airway pressure devices, infant monitoring equipment and services, home sleep studies-related therapy equipment, and other respiratory therapy and durable medical equipment, products, supplies and services to customers in their homes or other alternative site care facilities; and

(ii)   the term "participate" includes, but is not limited to, any direct or indirect interest in or provision of services to any enterprise, or any affiliate of an enterprise, whether as an officer, director, employee, equity holder, partner, member, sole proprietor, agent, representative, independent contractor, consultant, franchiser, franchisee, lender, owner or otherwise; provided, however, that the term "participate" shall not include ownership of less than 1% of the stock of a publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market.

(c)   During the Restriction Period, the Employee shall not, directly or indirectly: (i) induce or attempt to induce any employee of any Lincare Entity to leave his or her employ of such Lincare Entity or in any way interfere with the relationship between any such employee and such Lincare Entity, or (ii) induce or attempt to induce any customer, supplier, patient, independent contractor, payor, vendor, or referral source of any of the Lincare Entities at any time during the 2-year period immediately preceding the Employee's termination, to

cease doing business with any of the Lincare Entities, or to transact any business with a competitor of any of the Lincare Entities.

3.   Confidentiality.   (a)   The Employee acknowledges that the Employee has had access to Confidential Information with respect to Lincare and other Lincare Entities.   For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information of or relating to any of the Lincare Entities (including, but not limited to, past, present or prospective market, sales, product, customer and referral source information, prices and pricing structure, contractual arrangements, company practices, policies and procedures, product and process knowledge, cost and supplier information, personnel data, and any strategy or plans related to any of the foregoing) which is not generally available or disclosed to the public by the Lincare Entities.   The Employee acknowledges that all such information is a valuable and unique asset and constitutes confidential and/or proprietary information and trade secret information of the Lincare Entities, and the Employee shall (i) keep such information confidential; (ii) use such information solely for the purpose of performing the Employee's obligations as an employee of Lincare; and (iii) not otherwise disclose or make use of such information during the term of the Employment's employment with Lincare or afterwards.

(b)   All written information, drawings, documents and materials prepared by or furnished by any of the Lincare Entities or the Employee in the course of or as a result of the Employee's employment with Lincare will be the sole and exclusive property of the Lincare Entities and shall be delivered to Lincare by the Employee on demand or immediately upon the Employee's cessation of employment with Lincare for any reason whatever or for no reason.

4.   Acknowledgments.   (a)   The Employee acknowledges and agrees that it is a legitimate interest of Lincare, and reasonable and necessary for the protection of the Confidential Information, goodwill and business of the Lincare Entities, that the Employee make the covenants contained in this Agreement and that Lincare would not have paid the Employee the consideration contained in Section 1 without the covenants set forth in this Agreement.

(b)   The Employee acknowledges and agrees that the covenants contained in this Agreement are reasonable with respect to their duration, geographical area and scope.   If at the time of enforcement of any of the provisions of this

3

Agreement, a court holds that the restrictions stated therein are unreasonable under the circumstances then existing, the Parties agree (i) such provisions be amended to the extent of the maximum limitations permitted by applicable law, such amendment applying only within the jurisdiction of the court that made such adjudication and such provisions otherwise being enforced to the maximum extent permitted by law and (ii) within 30 days after such finding, the Employee shall reimburse Lincare the monetary consideration set forth in <u>Section 1</u> in proportion to the reduction of the obligation of, or restriction upon, the Employee.

(c)   The Employee acknowledges and agrees that a breach of the covenants and obligations in this Agreement will not be adequately compensated by monetary damages.  The Employee agrees that Lincare shall be entitled to (i) preliminary and permanent injunctive relief, without the necessity of proving actual damages or posting of a bond and (ii) an equitable accounting of all earnings, profits and other benefits arising from any violation of this Agreement, which rights shall be cumulative and in addition to any other rights or remedies to which Lincare may be entitled.  Lincare shall be entitled to reimbursement for all reasonable attorneys' fees and other expenses incurred in connection with the enforcement of the covenants and obligations contained in this Agreement.

(d)   The Employee acknowledges and agrees that the Restriction Period will not expire, and will be tolled, during any period in which the Employee is in violation of any restrictions to which the Restriction Period applies, and all such restrictions will automatically be extended by the period of the Employee's violation of any such restrictions.

5.   <u>Other Provisions.</u>   (a) This Agreement must not be amended, modified, or otherwise changed except by a writing signed by the Parties. (b) This Agreement is binding upon and inures to the benefit of the Parties and their respective successors, assigns, and legal representatives; provided, however, that the rights, duties, and obligations of the Employee under this Agreement are personal and cannot be delegated, assigned, or otherwise transferred by the Employee. Lincare may assign its rights hereunder to another Lincare Entity or in connection with a sale of all or substantially all of the business of Lincare and/or any other Lincare Entity.  (c) The Parties agree and herby consent to jurisdiction and venue, for any claim brought for breach or threatened breach of this Agreement of any state or federal court situated in Pinellas or Hillsborough County, Florida. This Agreement is governed by

4

Florida law. (d)   The Restriction Period will be extended by any period for which the Employee is in violation of any provision of this Agreement. (e) The Parties represent that they have read and understand this Agreement, they were provided with an opportunity to consult with counsel, and they intend to be legally bound by the terms contained herein. (f) This Agreement in no way alters or affects the Employee's status as an at-will employee of Lincare.   (g)   This Agreement may be amended, superseded, canceled, renewed or extended and the terms hereof may be waived only by a written instrument signed by the Parties.   (h)   This Agreement may be executed by one or more counterparts, each of which independently shall be deemed to be an original and all taken together shall constitute one instrument.   Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

In witness whereof, the Parties have caused this Agreement to be signed effective as of the date contained in this Agreement's introductory clause.

LINCARE INC.

By: _____
Name: _____
Title: _____

Date signed by
Lincare: _____4/9/13_____

_____
Esther D. Tinklenberg
Date signed by
Employee: March 20, 2013.

5